## AFFIDAVIT IN SUPPORT OF SEARCH AND SEIZURE WARRANT

I, Anita Sowers, Task Force Officer, United States Department of Justice, Drug Enforcement Administration, being duly sworn, do declare and state the following:

1.     I am a Task Force Officer ("TFO") with the Drug Enforcement Administration ("DEA"), currently assigned to the Roanoke Tactical Diversion Squad ("TDS") in the Washington Field Division. As a duly appointed TFO in the DEA, I am charged with the duty of enforcing the Controlled Substance Act, and am authorized under Title 21, United States Code, Section 878 to carry firearms, execute warrants, make arrests for offenses against the United States of America, and to perform other law enforcement duties as authorized by law.

2.     I was employed with the City of Martinsville in 1997 as a Deputy and served as a Corrections Deputy until 2000 when I became a Police Officer for the City of Martinsville. I have attended basic training courses for both core series provided by the Commonwealth of Virginia, Department of Criminal Justice Services. I have been certified as a law enforcement officer for 20 years and assigned to the Special Investigation Unit for two (2) years. In that capacity, my duties include the investigation of narcotic cases, including assisting with general investigations. In January 2017, I was deputized as a TFO with the DEA. I have received special training in drug identification and drug diversion methods from various local, state, federal law enforcement and regulatory agencies.

3.     By virtue of the position as a TFO, your Affiant is a federal law enforcement officer empowered to conduct investigations concerning the unlawful possession, possession with intent to distribute, and unlawful distribution of controlled substances, and associated conspiracies, and to make arrests for violations of Title 21, United States Code, Sections 841 and 846. As a DEA

1

TFO, your Affiant has participated in multiple investigations involving the unlawful possession, manufacture, and distribution of controlled substances, including pharmaceutical diversion of controlled substances.

4.     During the course of these investigations, I have utilized a variety of investigative techniques and resources, including physical and electronic surveillance and various types of informants and cooperating sources. Through these investigations, my training and experience, and conversations with other experienced Agents and law enforcement personnel, I have become familiar with statutes and regulations that govern the handling (i.e. ordering, processing, manufacturing, distributing, prescribing, dispensing, administering, importing and exporting) of controlled substances by DEA registrants.[1] Moreover, I am familiar with the modus operandi of DEA registrants who, independently or in concert with others, abuse their authority in a manner that controlled substances are ultimately diverted from the legitimate system of distribution to the illicit market. Often, such diversion occurs from an ostensibly legitimate business or businesses by complicit registrants and/or complicit employees of registered individuals or entities: the use of telecommunications devices for oral and/or typed messaging between or among participants of the scheme; the movement of U.S. Currency by cash transactions and electronic transfers between accounts; and fraudulent aesthetics to present a façade of a legitimate business. Such aesthetics may include: requesting and maintaining medical documentation and history, which may be outdated, false, or is not reviewed or used in "treatment" decisions; maintaining paper or electronic patient files, which contain false reporting

---

[1] A DEA Registrant is an individual (physician, pharmacist, veterinarian, etc.,) who received a DEA Registration Number authorizing the prescribing and/or dispensing of Schedule II through V controlled substances.

2

of client visits, diagnostic testing, and in which notes are often copied from previous visits; and dressing staff in medical scrubs, despite staff not being medically trained, certified, or licensed.

5.     This affidavit is based upon my personal knowledge and participation in an ongoing drug investigation and the personal knowledge and participation of other experienced law enforcement officers participating in this investigation.

## **INTRODUCTION**

6.     There is probable cause, based on information contained in this affidavit, to believe that Vincent K. JONES, MD, and Ricky MITCHELL, and others known and yet unknown are operating businesses and/or managing bank accounts in furtherance of a conspiracy to distribute Schedule II and Schedule IV controlled substances (namely oxycodone and hydrocodone-acetaminophen and possibly others) in violation of Title 21, United States Code, Sections 841(a)(1) and 846. JONES and others are using, and will continue to use, COMMUNITY FAMILY CARE ("CFC") to distribute Schedule II and Schedule IV controlled substances in violation of Title 21, United States Code, Section 846 and 841 (a)(1) and Title 21, United States Code, 856(a)(1). In addition, as set forth herein, there is probable cause to believe that JONES and others are using CFC to commit Health Care Fraud and Wire Fraud in violation of Title 18, United States Code Section 1347 and 1343, respectively.

7.     From my experience with investigations involving illicit distribution and uses of pharmaceutical drugs, I know that the above-described controlled substances are presently highly subject to abuse and are available in the illicit marketplace, not only in the Western District of Virginia, but also throughout the United States.

3



8.    As used in this affidavit and pursuant to Title 21, C.F.R., Section 1300.01 (35), the term "prescription" is an order for medication dispensed to or for an ultimate user, but does not include an order for medication that is dispensed for immediate administration to the ultimate user. As further used in this affidavit and pursuant to Title 21, C.F.R., Section 1306.04(a), "[a] prescription for a controlled substance to be effective must be issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his/her professional practice. The responsibility for the proper prescribing and dispensing of controlled substances is imposed primarily on the prescribing practitioner, but a corresponding responsibility rests with the pharmacist who fills the prescription. An order purporting to be a prescription issued not in the usual course of professional treatment or in legitimate and authorized research is not a prescription within the meaning and intent of section 309 of the Act (21 U.S.C. 829) and the person knowingly filling such a purported prescription, as well as the person issuing it, shall be subject to the penalties provided for violations of the provisions of law relating to controlled substances."

9.    Your Affiant believes that, based on the information set forth, searches of the following locations, collectively referred to as "TARGET PREMISES," will lead to evidence, fruits, and instrumentalities of the aforementioned crimes, as well as to the identification of individuals who are engaged in the commission of those crimes:

   a.   CFC, 1856 Virginia Avenue, Martinsville, VA (the "BUSINESS PREMISES");

   b.   JONES' primary residence, located at 1308 Cardinal Lane, Martinsville, VA (the "RESIDENCE");

4

10.     In addition, there is probable cause to believe that the following financial accounts held

by JONES and CFC contain funds that have been derived from illegal activity and are all subject

to seizure and forfeiture:

   a.  BB&T Business Value 500 Checking Account 0005132475751 in the name of
       Community Family Care (CFC)

   b.  BB&T Bright Banking Account 1470000014729 in the name of Vincent K. Jones

   c.  BB&T Personal Money Rate Savings Account 0000151907903 in the name of
       Vincent K. Jones

   d.  BB&T Personal Regular Savings Account 0005530571493 in the name of
       Vincent K. Jones.

11.     Not all of the facts of the investigation known to me are contained herein; rather, only

those facts necessary to establish probable cause for the searches of the above-listed locations

and seizure of the above-referenced accounts have been included.

12.     JONES is registered with the DEA as a Practitioner with the authority to handle, to

include prescribe, order, and/or administer, controlled substances in Schedules 2, 2N, 3, 3N, 4,

and 5 under DEA Registration Number BJ6136065, issued December 7, 1998 with an expiration

date of December 31, 2019.  On May 6, 2018, JONES received a waiver under 21 U.S.C. §

823(g)(2)(B) to treat a maximum of 30 patients at one time for maintenance and detoxification

treatment of opioid addiction in accordance with the Drug Addiction Treatment Act of 2000

under DEA Registration Number XJ6136065. JONES' registered address is 1856 Virginia

Avenue, Martinsville, Virginia.

## PROBABLE CAUSE OF ONE OR MORE CRIMES

### Jones's Relationship with Patient CS3

5

13.     On March 14, 2019, Confidential Source 3 ("CS3") was interviewed by your Affiant and Human and Health Services Special Agent Robert Slease regarding his/her knowledge of JONES. The interview took place at the Martinsville Police Department located in the vicinity of 55 West Church Street, Martinsville, Virginia. CS3 received prescriptions from JONES and provided the following information:

   a. CS3 stated that he/she had been a patient of JONES since 2014 and was being treated for high blood pressure, leg pain related to knee surgery and a torn anterior cruciate ligament, and back pain from a fall. CS3 stated JONES prescribes him/her high blood pressure and cholesterol medication as well as Xanax and oxycodone every month.

   b. CS3 stated that he/she has met JONES on the street to obtain his/her prescriptions when CS3 did not have money to pay for an office visit or when he/she did not have transportation. CS3 stated that JONES would present prescriptions for oxycodone and Xanax out of the window of JONES' vehicle to CS3. CS3 stated on another occasion he/she went to JONES' residence to obtain prescriptions for oxycodone and Xanax.

   c. CS3 stated that JONES had provided a prescription for oxycodone-acetaminophen 5/325 for CS3's daughter AK. CS3 stated that AK was not a patient of JONES and had not been examined by JONES.

   d. CS3 admitted to having a sexual relationship with JONES. CS3 stated the sexual relationship started in or around 2014 and that the encounters occur at JONES' residence. CS3 stated that JONES would send CS3 text messages when JONES wanted to meet.

14.     On March 14, 2019, Diversion Investigator (DI) Bobby Horton, Group Supervisor (GS) Dziedzic, and TFO Findley conducted an interview of A.K. at Martinsville Police Department (MPD). A.K. agreed to speak with investigators regarding a prescription of oxycodone-acetaminophen 5-325mg, written to AK by JONES on May 15, 2018. According to A.K., he/she had no knowledge of the prescription. A.K. stated that he/she is not a patient of JONES and has never met JONES. A.K. stated that his/her mother was a patient of JONES and has been for a few years. A.K. stated his/her mother is seen monthly by JONES and is prescribed medication.

15.     On March 14, 2019, SA Josh Rogers, Investigative Specialist (hereafter "IS") Devin

England, and DI Paula Albert interviewed P.T.H. at MPD about his/her time as a patient of

JONES. P.T.H. provided the following information:

   a. He/she starting seeing JONES as a patient in about 2017, and went to JONES for
      approximately a year or more. PTH stated that JONES prescribed him/her oxycodone
      5mg.

   b. P.T.H. stated that she knows CS3, and that for approximately a three-year period
      prior to January 2019, CS3 did not have a job or insurance and was having sex with
      JONES to get prescriptions. P.T.H. stated CS3 would meet JONES at his house or
      wherever to perform sex acts, including oral sex. P.T.H. stated JONES would text
      CS3 to meet. P.T.H. stated CS3 started seeing JONES in the office in January 2019
      when CS3 started receiving Virginia Medicaid.

## Prescription Drug Diversion by Patients Treated by JONES

16.     Through the course of this investigation, your Affiant learned that several patients of

JONES were distributing pharmaceuticals prescribed to them by JONES. Further investigations

by the Henry County Sheriff's Office and MPD resulted in controlled purchases of narcotics

from several patients of JONES. These individuals were later direct indicted by those agencies'

respective court system and the suspects were arrested. Members of Roanoke Resident Office

("RRO") TDS attempted to interview those suspects. Although there is no direct evidence that

JONES is aware of these arrests, Martinsville is a small community of less than 15,000 residents.

The following patients of JONES were arrested for unlawfully distributing pills obtained via

prescriptions that JONES wrote:

   a. On March 19, 2018, Henry County Sheriff's Office acquired a Grand Jury
      indictment for C.S.M., for one count of Distribution of Oxycodone. On March 21,
      2018, C.S.M. was arrested by Henry County Sheriff's Office for Distribution of
      oxycodone. According to the Virginia Prescription Monitoring Program
      ("VAPMP") database, C.S.M. has received eleven (11) prescriptions for

oxycodone HCL 10mg tablets totaling 1,290 dosage units, two (2) prescriptions for oxycodone HCL 5mg tablets totaling 120 dosage units from January 2017 to March 2018 which were prescribed by JONES.

b. On November 8, 2018, K.L. was arrested for distribution of hydrocodone second offense and distribution of Fentanyl second offense. According to VAPMP, K.L. did not receive hydrocodone or fentanyl but KL did receive five (5) prescriptions for oxycodone HCL 15mg tablets totaling 390 dosage units, fifteen (15) prescriptions for oxycodone HCL 10mg tablets totaling 1,170 dosage units, two (2) prescriptions for oxycodone HCL 5mg tablets totaling 120 dosage units from June 2017- October 2018 prescribed by JONES.

c. S.C. was arrested for three (3) counts of distribution of oxycodone. VAPMP data shows S.C. receiving four (4) prescriptions of oxycodone-acetaminophen 10-325 for a total of 240 dosage units on December 18, 2017, and the charges for the offense occurred on December 20 and 21, 2017. S.C. received thirteen (13) prescriptions of oxycodone-acetaminophen 5-325 for a total of 780 dosage units. According to VAPMP, the prescription was filled on January 16, 2018 and the offense date for the charge occurred on the same date. All prescriptions were prescribed by JONES.

d. J.F. was arrested for distribution of Alprazolam and two (2) counts of distribution of oxycodone. VAPMP data shows JF receiving four (4) prescriptions for oxycodone HCL 10mg for a total of 240 dosage units, four (4) prescriptions for oxycodone HCL 15mg for a total of 240 dosage units, three (3) prescriptions for oxycodone HCL 20mg for a total of 360 dosage units, eight (8) prescriptions for oxycodone HCL 30mg for a total of 960 dosage units, eleven (11) prescriptions for Alprazolam 1mg for a total of 720 dosage units, three (3) prescriptions for Alprazolam .25mg for a total of 180 dosage units and five (5) prescriptions for Alprazolam .5mg for a total of 300 dosage units from January 2017 through November 2018; all of which were prescribed by JONES.

e. M.H.S. was arrested for two (2) counts of distribution of hydrocodone. VAPMP data shows M.H.S. receiving eighteen (18) prescriptions for hydrocodone-acetaminophen 10-325mg for a total of 2,160 dosage units and four (4) prescriptions for hydrocodone-acetaminophen 5-325mg for a total of 480 dosage units from January 2017 through October 2018. One prescription was filled on June 18, 2017 and the offense date leading to the charge was on June 19, 2017. Another prescription was filled on July 18, 2017. All prescriptions were prescribed by JONES.

f. G.H. was arrested for distribution of oxycodone, distribution of methadone, and conspiracy to distribute oxycodone. VAPMP data shows G.H. receiving one (1) prescription for oxycodone HCL 30mg for a total of 120 dosage units, thirteen (13) prescriptions for oxycodone HCL ER 80mg for a total of 1,170 dosage units, and nine (9) prescriptions for OxyContin 80mg for a total of 780 dosage units prescribed by JONES. According to VAPMP, a prescription for oxycodone was

filled on December 15, 2017 and the offense date for the charge occurred on the same date.

g. O.T. was arrested for distribution of morphine second offense, distribution of hydrocodone second offense, and distribution of oxycodone second offense. VAPMP data shows O.T. receiving twenty-four (24) prescriptions for oxycodone HCL 10mg for a total of 2,010 dosage units from January 2017 through November 2018 prescribed by JONES. According to VAPMP, a prescription for oxycodone was written by JONES and filled on January 19, 2018 the same date as the offense date.

h. M.S. was arrested for two counts of distribution of Hydrocodone. VAPMP data shows M.S. receiving twelve (12) prescriptions for hydrocodone-acetaminophen 5-325 for a total of 720 dosage units, and ten (10) prescriptions for hydrocodone-acetaminophen 10-325 for a total of 900 dosage units from January 2017 through October 2018 prescribed by JONES. According to VAPMP, a prescription for hydrocodone-acetaminophen 5-325mg was filled on October 25, 2017 and the offense date for the charge occurred on October 26, 2017. Another prescription for hydrocodone-acetaminophen 5-325mg was filled on December 24, 2017, prescribed by JONES.

17. After he/she was arrested, JONES patient M.H.S. was interviewed by TFO Angela Simpson, TFO Clements, and TFO Lawrence Findley. M.H.S. stated that he/she provided a urine sample for drug screening every three (3) months. M.H.S. stated on two occasions, he/she had provided a urine sample which did not contain trace of the medication that M.H.S. was prescribed.[2] Based on Your Affiant's training and experience, the absence of prescribed medication in a urine sample is significant because it can be an indicator that the patient is taking the medication too quickly, or is diverting (i.e., selling) some of the pills prescribed.

---

[2] M.H.S. and other patients of JONES did claim that their prescription medication is a necessity to managing their pain.

9

18. M.H.S. stated that JONES advised M.H.S. that he/she better have the medication in his (MHS) system on the following drug screen. M.H.S. stated that JONES did not mention nor was any action taken following the two failed drug screens.

19. G.H. was also interviewed, and similarly stated that JONES administers drug screenings about every three (3) months. G.H. said he/she is unaware if he/she had ever failed a drug screen, but said one time in 2017, he/she "didn't have enough in [him/her]."

20. O.T. was interviewed by TFO Clements, TFO Simpson, and TFO Lawrence Findley. O.T. stated that he/she had been a patient of JONES for approximately four years and was being treated for pain from kidney stones. OT stated that he/she heard about JONES on the street and that JONES has a reputation of being a physician who will prescribe "whatever you need".

21. O.T. explained that JONES has a number of patients who are able to walk directly into the back office area and obtain a prescription. O.T. estimated that these individuals are typically on the premises for approximately five (5) minutes. O.T. also stated that JONES has posted signs in the office stating that patients should not come to his (JONES') house. O.T. stated that he/she had direct knowledge that CS3 has received prescriptions from JONES on days that the office was not open.

### Review of Records of Jones' Prescribing Practices

22. In a series of investigations dating back to 2007, JONES was – at least twice – ordered by the Virginia Board of Medicine and to undergo continuing education related to the prescribing of opioids. Nonetheless, a review by the Department of Health Professions ("DHP") of his patient records show inconsistent and inadequate patient visits, and effective May 1, 2019, JONES was

10

prohibited from prescribing Schedule II or III controlled substances, and prohibited from supervising any prescriber of such substances by the Virginia Board of Medicine.

23. In August 2016, the U. S. Food and Drug Administration (hereafter FDA), sent out a safety announcement about serious risks and death when combining opioid pain or cough medicine with benzodiazepines. According to a FDA review found that the growing combined use of opioid medicines with benzodiazepines or other drugs that depress the central nervous system (hereafter CNS) has resulted in serious side effects, including slowed or difficulty breathing and deaths. FDA issued a "Boxed Warning" in an effort to decrease the use of opioids and benzodiazepines, or other opioids and CNS depressants, together.

24. Based on training and experience, your Affiant knows that opioids and benzodiazepines are desirable drugs of choice for illegitimate recreational use and are a commodity in the illicit market.

25. During the course of this investigation, investigators have obtained raw prescription data for controlled substances filled in Virginia between January 2014 to January 2019 by employees of JONES, which indicated that approximately 449 controlled substance prescriptions were issued or authorized by JONES and filled in Virginia totaling approximately 44,850 dosage units to three (3) of the five (5) presumed employees of CFC:

    a. Employee 1 received 247 prescriptions accounting for 21,910 dosage units, 138 being Opioid prescriptions accounting for 13,849 dosage units, and 54 times a combination of an Opioid and Benzodiazepine was prescribed.

    b. Employee 2 received 74 prescriptions accounting for 7,140 dosage units, 42 being Opioid prescriptions accounting for 6,180 dosage units.

11



c. Employee 3 received 128 prescriptions accounting for 15,800 dosage units, 67 being Opioid prescriptions accounting for 9,440 dosage units, and 56 times a combination of an Opioid and Benzodiazepine was prescribed.

## Interviews Regarding Office Practices at CFC

26.     On August 31, 2017, your Affiant and TFO Clements spoke with a Source of Information (hereafter "SOI1") regarding CFC and the prescribing practices of JONES. SOI1 stated that he/she spent approximately five (5) weeks working at CFC as an intern between June and July of 2017. SOI1 recalled that some patients never saw JONES at all – the patients would ask if they were going to see JONES as the SOI1 was handing them their prescriptions at the end of the appointment. The SOI1 further stated that he/she observed a lot of cash at CFC and that every patient paid $70.00 in cash whether they had insurance or not. The SOI1 recollected several instances where patients complained that they were charged multiple times for the same visit.

27.     The SOI1 recalled several occasions where JONES provided a prescription to patients when the SOI1 believed the patient should not have been given one. The SOI1 stated on one occasion a patient appeared to be intoxicated to the point that they were unable to stand up and needed assistance to their seat in the waiting room. The patient left CFC with a prescription for pain medication written by Jones.[3] The SOI1 provided another example of a patient who was given a drug screen, which subsequently was positive for cocaine. The SOI1 stated that he/she observed JONES give directions to throw the test out and JONES then proceeded to give the

---

[3] This SOI and others also noted that JONES did not give prescriptions to every single patient; some patients left JONES's clinic without prescriptions.

12

patient a prescription for pain medication. The SOI1 stated that JONES often skipped scheduled drug screening of patients.

28.     The SOI1 stated that JONES was worried about a particular patient (J.S.) who died approximately four days after his last visit. According to SOI1, JONES opted not to give (J.S.) a drug screen on his last appointment before his death.

29.     Even though he sometimes failed to give drug screens, the SOI1 stated that JONES would have every patient that smoked go through a spirometry test because JONES made more from Medicaid when JONES could bill for the test.

30.     On May 30, 2018, your Affiant, Group Supervisor (hereafter "GS") Chris Dziedzic, and MPDSIU Richard Barrow, Eric Eggleston, and Jonathan Cox met with a documented confidential source (hereafter "CS2") to discuss the CS2's involvement with JONES and CFC.

31.     CS2 explained his/her past experiences as a patient of JONES and what occurred during a routine visit. CS2 stated that appointments with JONES are scheduled at 8:00 am but JONES will not show up until around 10:00 am. By 10:00 am, there are approximately 20 patients waiting in the waiting room when JONES arrives. CS2 stated that employee R.S. will call patients back to the exam room. CS2 stated that R.S. or MITCHELL will obtain the blood pressure before JONES arrives in the exam room. CS2 stated that JONES will come in the exam room and ask if a prescription is needed. CS2 stated that JONES never asks about the patient's medical condition. CS2 stated that he/she has seen patient files in the office but has not seen JONES bring patient files into an exam room with him.

**Interview Regarding MITCHELL's Activities**

13

32.     Beginning in or about August 2017, investigators assigned to the RRO TDS received

information from Lieutenant Richard Barrow of the Martinsville Police Department Special

Investigation Unit (hereafter "MPDSIU"), stating that a MPDSIU Confidential Informant

(MPDSIU CI) was able to illegally (i.e., "on the street") purchase Schedule II controlled pain

medication from MITCHELL, who is employed by CFC.

33.     On August 21, 2017, Special Agent (hereafter "SA") Jim Terpening, your Affiant, TFO

David Clements, along with MPDSIU Sergeant Eric Eggleston and Officer Harley Durham

interviewed the MPDSIU CI. According to the MPDSIU CI, MITCHELL acts as a sponsor by

paying for patients' appointments in exchange for the patient supplying MITCHELL with a

portion of the patient's prescription.

34.     Urine drug tests are commonly used in pain medicine practices to determine whether a

patient is taking illicit drugs or diverting the drugs prescribed. The MPDSIU CI stated that if a

patient was worried about passing a urine drug test, MITCHELL would tell JONES to bypass the

drug screen.

## PROBABLE CAUSE RE: THE PREMISES

35.     As set forth above, there is probable cause to believe that evidence of the crimes of (a)

unlawful distribution of controlled substances; (b) health care fraud; and (c) wire fraud will be

found at the TARGET PREMISES. Specifically:

   a. Numerous sources listed above indicated that they went to the BUSINESS

      PREMISES to obtain prescriptions. The existence or non-existence of patient records,

      cash, employee policies and procedures, training materials, medical equipment, and

14

general environs of the practice are among the evidence expected to be found at the office location. This is not a complete list of all evidence expected to be found.

b. In addition, this application seeks permission to search certain electronic evidence as it may be found on JONES's person, or at the TARGET PREMISES. Specifically, CS3 told investigators that s/he communicated about prescriptions and sexual encounters with JONES via text message.

c. On October 5, 2018, your Affiant was connected to a three-way call by CS2 involving CS2 and P.T.H.. According to P.T.H., CS3 had utilized P.T.H.'s cell phone to contact JONES on September 28, 2018 to inquire about setting up a time and place to meet to obtain CS3's prescriptions. P.T.H. stated that JONES replied by saying that he needed a massage.

d. Finally, this application seeks permission to search JONES's home. CS3 stated that, on several occasions, she went to the RESIDENCE to have sex with JONES. *Based on your Affiant's training and experience that physicians can store office information at the residence including but not limited to* COMPUTERS AND ELECTRONIC STORAGE MEDIA *prescription pads, notes on patients, and patient files etc.*

36.    As described above and in Attachments B and D, this application seeks permission to search and seize certain records and evidence of the target offenses that might be found at the TARGET PREMISES in whatever form they are found.  Your Affiant submits that if a computer, thumb drive, cellular phone, tablet, or other electronic storage medium is found at the TARGET PREMISES, there is probable cause to believe those records may be stored in that computer or other electronic storage media, for at least the following reasons:

37.    CS3 told agents that during a typical appointment, JONES would sometimes type into a computer located at the BUSINESS PREMISES.

38.     Based on my knowledge, training, and experience, your Affiant knows that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a hard drive, deleted or viewed via the Internet. Electronic files downloaded to a hard drive can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using readily-available forensics tools. This is so because when a person "deletes" a file on a home computer, the data contained in the file does not actually disappear; rather, that data remains on the hard drive until it is overwritten by new data. Electronic data may also be stored in cloud-based or web-hosted applications and software, such as HealthFusion EMR software or Dropbox. Furthermore, based on your affiant's training, knowledge, and experience, and on information relayed to me by other agents, your affiant knows that information can be stored in a variety of locations including, but not limited to, hand written or typed paper documents, notes, ledgers, receipts, negotiated instruments, contracts, bank statements, computers, thumb drives, hard drives, cell phones, and other devises or instruments. Additionally, for a number of reasons, it is not always possible to search computer equipment and storage devices for data during the search of the premises, and thus such items may need to be seized.

39.     Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the hard drive that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

40.     Similarly, files that have been viewed via the Internet are typically automatically downloaded into a temporary Internet directory or "cache." The browser often maintains a fixed amount of hard drive space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed Internet pages or if a user takes steps to delete them.

16



41.     In this case, the warrant application requests permission to search for and to seize a variety

of records, including drug/medication purchases, drug transaction records, patient/recruit records,

scheduling and travel records, and financial transactions, including those that may be stored on a

computer. These things constitute evidence of the crimes being committed. From my training and

experience, your Affiant believes that a computer can be used to store records or information

relating to a crime of this type such as the items described in Attachments B, D, and E, as well as

notes as to how the criminal conduct was achieved, records of Internet discussions about the crime,

and other records that indicate the nature of the offense.

42.     Based upon my knowledge, training and experience, your Affiant knows that searching

for information stored in computers often requires agents to seize most or all electronic storage

devices to be searched later by a qualified computer expert in a laboratory or other controlled

environment. This is often necessary to ensure the accuracy and completeness of such data, and

to prevent the loss of the data either from accidental or intentional destruction. Additionally, to

properly examine those storage devices in a laboratory setting, it is often necessary that some

computer equipment, peripherals, instructions, and software be seized and examined in the

laboratory setting. This is true because of the following:

    a.  The volume of evidence. Computer storage devices (like hard disks or CD-ROMs) can

       store the equivalent of millions of pages of information. Additionally, a suspect may

       try to conceal criminal evidence; he or she might store it in random order with deceptive

       file names. This may require searching authorities to peruse all the stored data to

       determine which particular files constitute evidence or instrumentalities of crime. This

       sorting process can take weeks or months, depending on the volume of data stored, and

       it would be impractical and invasive to attempt this kind of data search on-site.

b. Technical requirements. Searching computer systems for criminal evidence sometimes requires highly technical processes requiring expert skill and properly controlled environment. The vast array of computer hardware and software available requires even computer experts to specialize in some systems and applications, so it is difficult to know before a search which expert is qualified to analyze the system and its data. In any event, however, data search protocols are exacting scientific procedures designed to protect the integrity of the evidence and to recover even "hidden," erased, compressed, password-protected, or encrypted files. Because computer evidence is vulnerable to inadvertent or intentional modification or destruction (both from external sourcesor from destructive code imbedded in the system as a "booby trap"), a controlled environment may be necessary to complete an accurate analysis.

43. In light of these concerns, your Affiant hereby requests the Court's permission to seize the computer hardware, phones, tablets (and associated peripherals) that are believed to contain some or all of the evidence described in the warrant, and to conduct an off-site search of the hardware for the evidence described.

44. Searching electronic systems for the evidence described in Attachment B and D may require a range of data analysis techniques. In some cases, it is possible for agents to conduct carefully targeted searches that can locate evidence without requiring a time-consuming manual search through unrelated materials that may be commingled with criminal evidence. In other cases, however, such techniques may not yield the evidence described in the warrant. Criminals can mislabel or hide files and directories, encode communications to avoid using key words, attempt to delete files to evade detection, or take other steps designed to frustrate law enforcement searches for information. These steps may require agents to conduct more extensive searches, such as

scanning areas of the disk not allocated to listed files, or peruse every file briefly to determine whether it falls within the scope of the warrant. In light of these difficulties, your Affiant intends to use whatever data analysis techniques appear necessary to locate and retrieve the evidence described in Attachments B and D. As set forth above, your Affiant respectfully submits that there is probable cause to believe that some of the information for which this affidavit seeks authority to search is generated on a computer and may be stored on a computer, servers, external hard-drives, discs, USB drives, SD cards, memory chips, backup tapes, or utilizing cloud-based and/or web-based storage applications located and/or accessed on the internet.

## SEIZURE OF PROPERTY

45.     A review of the financial records obtained from Branch Banking & Trust Company (BB&T) for the time period of January 2014 to May 2019 revealed that JONES is the owner/signatory for at least four accounts as listed below, each of which is believed to contain proceeds derived from and be used in furtherance of the illegal activity.

> BB&T Business Value 500 Checking Account 0005132475751 in the name of Community Family Care (CFC)

> BB&T Bright Banking Account 1470000014729 in the name of Vincent K. Jones

> BB&T Personal Money Rate Savings Account 0000151907903 in the name of Vincent K. Jones

> BB&T Personal Regular Savings Account 0005530571493 in the name of Vincent K. Jones.

46.     **BB&T BUSINESS VALUE 500 CHECKING ACCOUNT 0005132475751**: JONES maintains the premises for the purpose of distributing controlled substances in violation of 21 U.S.C. § 856(a)(1). JONES utilizes BB&T Business Value 500 Checking Account

0005132475751 to maintain his medical practice CFC, located at 1856 Virginia Ave, Martinsville, VA. JONES is a signatory for this account as well as Rhonda C. Enalls.

a. Based on a review by your Affiant of the banking records received from BB&T related to JONES and CFC, they show that JONES receives numerous insurance reimbursements every month directly into CFC BB&T Business Value 500 Checking Account 000513247575. These deposits are from patients' insurance companies he bills from his medical practice, which he is operating outside the usual course of professional medical practice issuing prescriptions without a legitimate medical purpose. Additionally, several times a month large cash deposits are made into the Business Value 500 Checking Account 000513247575 which are believed to be from the cash paying clients that visit JONES clinic. The payments from the insurance companies and the cash deposits are derived partially from the individuals that come to JONES seeking prescriptions for controlled prescription narcotics. JONES is operating his clinic in such a manner that the individuals that are abusing prescription narcotics know that they can obtain one or more prescriptions from JONES simply by paying a copay or paying cash for a doctor visit in return for which they will receive their prescriptions for their desired prescription narcotics.

b. JONES utilizes the CFC BB&T Business Value 500 Checking Account to pay the rent, the insurance, the ADT security system, the utilities, and the internet bills for CFC. JONES also utilizes this account to pay all the payroll for his employees. JONES utilizes this account to pay his Virginia State income taxes, his federal income taxes and his medical license fees. This account, and the money in it, is

20

used to maintain JONES medical practice and its premises. JONES maintains the premises for the purpose of distributing controlled substances in violation of 21 U.S.C. § 856(a)(1). Therefore, this bank account facilitates JONES commission of maintaining the premises for illegal distribution.

47. **BB&T BRIGHT BANKING ACCOUNT 1470000014729 (JONES' PERSONAL CHECKING ACCOUNT):** Based on a review of JONES banking records by your Affiant, your Affiant believes that JONES utilizes the CFC BB&T Business Value 500 Checking Account 000513247575 containing the proceeds of his crimes to pay himself a monthly salary. JONES electronically transfers funds multiply times a month from CFC BB&T Business Value 500 Checking Account 000513247575 into his BB&T Bright Banking Account 1470000014729 which appears to be his personal checking account:

- On April 30, 2019, $4,000.00 was transferred from CFC BB&T Business Value 500 Checking Account 000513247575 into BB&T Bright Banking Account 1470000014729 (JONES' personal checking account).

- On May 2, 2019, $3,000.00 was transferred from CFC BB&T Business Value 500 Checking Account 000513247575 into BB&T Bright Banking Account 1470000014729 (JONES' personal checking account)

- On May 8, 2019, $7,000.00 was transferred from CFC BB&T Business Value 500 Checking Account 000513247575 into BB&T Bright Banking Account 1470000014729 (JONES' personal checking account)

- On May 21, 2019, $2,000.00 was transferred from CFC BB&T Business Value 500 Checking Account 000513247575 into BB&T Bright Banking Account 1470000014729 (JONES' personal checking account).

- On May 29, 2019, $3,000.00 was transferred from CFC BB&T Business Value 500 Checking Account 000513247575 into BB&T Bright Banking Account 1470000014729 (JONES' personal checking account)



48.     There are no direct deposits going into the personal checking account. It appears that the only monies going into the BB&T Bright Banking account 1470000014729 are the EFT from the CFC BB&T Business Value 500 checking account 000513247575.

49.     **BB&T PERSONAL MONEY RATE SAVINGS ACCOUNT 0000151907903:**

Based on a review of JONES banking records by your Affiant, your Affiant believes JONES has utilized CFC BB&T Business Value 500 Checking Account 000513247575 to fund his BB&T Personal Money Rate Savings account 0000151907903.

- On September 10, 2018, there was a transfer of $10,000.00 from CFC BB&T Business Value 500 Checking Account 000513247575 into BB&T Personal Money Rate Savings Account 0000151907903

- On August 29, 2018, there was a transfer of $6,000.00 from CFC BB&T Business Value 500 Checking Account into 000513247575 into BB&T Personal Money Rate Savings Account 0000151907903

- On April 13, 2018, there was a transfer of $10,000.00 from CFC BB&T Business Value 500 Checking Account 000513247575 into BB&T Personal Money Rate Savings Account 0000151907903

- On December 14, 2017, there was a transfer of $5,000.00 from CFC BB&T Business Value 500 Checking Account 000513247575 into BB&T Personal Money Rate Savings Account 0000151907903

50.     Based on the transactions, you Affiant believes JONES repeatedly funds his BB&T Personal Money Rate Savings Account 0000151907903 from the CFC BB&T Business Value 500 Checking Account 000513247575.

51.     **BB&T PERSONAL REGULAR SAVINGS ACCOUNT 0005530571493:** Based on a review of JONES banking records by your Affiant, your Affiant believes JONES has utilized CFC BB&T Business Value 500 checking account 000513247575 to fund his BB&T Personal Regular Savings account 0005530571493.

- On September 10, 2018, there was a transfer of $10,000.00 from CFC BB&T Business Value 500 Checking Account 000513247575 into BB&T Personal Regular Savings Account 0005530571493

- On April 13, 2018, there was a transfer of $10,000.00 from CFC BB&T Business Value 500 Checking Account into 000513247575 into BB&T Personal Regular Savings Account 0005530571493

- On March 5, 2018, there was a transfer of $900.00 from CFC BB&T Business Value 500 Checking Account into 000513247575 into BB&T Personal Regular Savings Account 0005530571493

- On March 6, 2018, there was a transfer of $900.00 from CFC BB&T Business Value 500 Checking Account into 000513247575 into BB&T Personal Regular Savings Account 0005530571493

- On January 3, 2018, there was a transfer of $8,000.00 from CFC BB&T Business Value 500 Checking Account into 000513247575 into BB&T Personal Regular Savings Account 0005530571493

- On December 12, 2017 there was a transfer of $5,000.00 from CFC BB&T Business Value 500 Checking Account into 000513247575 into BB&T Personal Regular Savings Account 0005530571493

52.     Based on the transactions, you Affiant believes JONES repeatedly funds his BB&T Personal Money Rate Savings account 0000151907903 from the CFC BB&T Business Value 500 Checking Account 000513247575.

## AUTHORIZATION SOUGHT

53.     The facts related to the investigation contained in this affidavit are limited and for the sole purpose of setting forth information to establish the probable cause to believe that federal criminal violations, including possession with the intent to distribute a controlled substance in violation of Title 21, United States Code, Sections 841(a)(1) and 846. JONES and others are using, and will continue to use the TARGET PREMISES to distribute controlled substances in violation of Title 21, United States Code, Section 846 and 841(a)(1) and 856(a)(1).

54.    Based on the information contained in this affidavit, your Affiant believes that the search of the TARGET PREMISES including the residence of JONES and CFC, including but not limited to curtilage, will glean evidence, fruits, and instrumentalities of the aforementioned crimes, as well as to the identification of individuals who are engaged in the commission of those crimes.

55.    Finally, the electronic devices associated with JONES and CFC, including but not limited to JONES' and MITCHELL's cellular phones, computers, tablets, and other devices found on the TARGET PREMISES will contain evidence, fruits, and instrumentalities of the aforementioned crimes, as well as to the identification of individuals who are engaged in the commission of those crimes.

56.    In addition, your Affiant believes that the financial accounts held by JONES and CFC contain funds that have been derived, at least in part, from illegal activity.

57.    It is requested that the warrant, application, and accompanying affidavit be sealed until further order of the Court in order to avoid premature disclosure of the investigation and to better ensure the safety of agents and others participating in the investigation, except that copies of the warrant in full or redacted form may be maintained by the United States Attorney's Office, and may be served by Special Agents and other investigators of the United States Drug Enforcement Administration, federally deputized state and local law enforcement officers, and other government and contract personnel acting under the supervision of such investigative or law enforcement officers, as necessary to effectuate the warrant.

58.    WHEREFORE, based on the foregoing, your Affiant's requests that the Court issue warrants authorizing (1) the search of CFC located at 1856 Virginia Avenue, Martinsville, VA as set forth in Attachments A and B; (2) the search of JONES' RESIDENCE, located at 1308 Cardinal Lane, Martinsville, VA, as set forth in Attachments C and D; (3) the search of all electronic devices

found at the TARGET PREMISES; and (4) the seizure of property set forth in Attachment E, all

within the Western District of Virginia, within 10 calendar days of the issuance of the requested

warrant.

Anita L. Sowers
Task Force Officer
Drug Enforcement Administration

Sworn to and subscribed before me this 16 day of July, 2019

Honorable Robert S. Ballou
United States Magistrate Judge
Western District of Virginia

ATTACHMENT A

1856 Virginia Avenue, Martinsville, Virginia is a commercial property brick and tan/red located in the Holiday Shopping Center. Entry is gained thru a glass door located to the right of the sign stating Community Family Care.



# ATTACHMENT B

The items to be seized include the following items:

With respect to violations of Title 21, United States Code, Sections 846 and 841(a)(1):
1.     any evidence of a crime;
2.     contraband, fruits of crime, and items illegally possessed; and
3.     property designed for use, intended for use, and used in committing a crime.

These items include, but are not limited to, the following items:

Records, documents, and materials present on or within 1856 Virginia Avenue, Martinsville, Virginia, as described in Attachment A, including in locked containers in whatever form they are maintained, including handwritten and computer generated, and controlled substances, including, but not limited to, the following items:

1.     Any and all records regarding the acquisition, prescribing, dispensing and inventory of controlled substances, including appointment books; sign-in sheets; patient lists, patient files and notes; patient referrals or other treatment records; video recordings of patient interviews or visits; prescriptions; dispensing logs; order forms; receipts; theft and loss reports; shipping records; packing slips; accounting ledgers; logs; patient payment records or receipts; receipts relating to the sale of controlled substances; the treatment history and payments of patients;

2.     Indicia of ownership, possession, control, or occupancy of the clinic owned by Dr. Vincent K. JONES and the premises searched, including incorporation records, business licenses, occupancy permits, utility and telephone bills, mail, rental or purchase agreements, and keys;

3.     Any and all currency, ledgers, invoices, receipts, accounting documents, bank statements and related records, bank passbooks and checks, credit card statements and receipts, money orders, wire transfers and transaction records, facsimile transmittals, letters of credit, bank money wrappers, tax returns and other tax records, safe deposit box or storage units keys, rental agreements and records, and other items evidencing the obtaining, secreting, transfer, investment and/or concealment of assets, and the obtaining secreting, transfer, concealment and/or expenditure of money by and on behalf of Dr. Vincent K. JONES.

4.     Any and all address and/or telephone books, Rolodex indices, correspondence and other papers or records reflecting the names, addresses, telephone or fax numbers of the owners, present and past patients, current and former employees, co-conspirators, financial institutions, and other individuals or businesses with whom a financial or business relationship exists, including manufacturers, wholesalers, or distributors of controlled substances, and financial institutions or services;

5.  Payroll, personnel files, correspondence and intra-office communications regarding Dr. Vincent K. JONES and all other past and current employees showing identities, employment position, employment contracts, salary and benefits, status, history, and duties, including educational background, training, professional licenses, and time and attendance records;

6.  Surveillance cameras, monitors, recording devices, related paraphernalia and surveillance videos;

7. ✶  During the execution of the search of the Target Premises described in Attachment A, law enforcement personnel are authorized to press the fingers (including thumbs) individuals found at the Target Premises to the Touch ID sensor of the Apple brand device(s), such as an iPhone or iPad, found at the Target Premises for the purpose of attempting to unlock the device via Touch ID in order to search the contents as authorized by this warrant; and *The agent must select the digit to use for Touch ID. If there is any objection by Jones*

8.  Computers and storage media. *or Mitchell, the agent is authorized to download the data but cannot search w/out further order of court. Sh*

9.  For any computer or storage medium whose seizure is otherwise authorized by this warrant, and any computer or storage medium that contains or in which is stored records or information that is otherwise called for by this warrant (hereinafter, "COMPUTER"):

    a.  evidence of who used, owned, or controlled the COMPUTER at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

    b.  evidence of the attachment to the COMPUTER of other storage devices or similar containers for electronic evidence;

    c.  evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the COMPUTER;

    d.  evidence of the times the COMPUTER was used;

    e.  passwords, encryption keys, and other access devices that may be necessary to access the COMPUTER;

    f.  documentation and manuals that may be necessary to access the COMPUTER or to conduct a forensic examination of the COMPUTER;

    g.  records of or information about Internet Protocol addresses used by the COMPUTER;

    h.  records of or information about the COMPUTER's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses;

✶ *The electronic devices in paragraph 7 must be associated with either Jones or Mitchell. sh*

        i.    contextual information necessary to understand the evidence described in this attachment.

10.      As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

11.      The term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile phones, tablets, servers, computers, and network hardware, and all software stored or accessed by such devices.

12.      The term "storage medium" includes any physical object upon which computer data can be recorded. Examples included hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.

The government is specifically authorized to seize all computers and storage media located on the premises described in Attachment A. The government is further authorized to search the content of such seized computers and storage media, both on-site and off-site by whatever means available to it, for the items sought in this warrant.

With respect to law enforcement's review of the COMPUTERS, law enforcement (i.e., the federal agents and prosecutors working on this investigation and prosecution), along with other government officials and contractors whom law enforcement deems necessary to assist in the review of the COMPUTERS (collectively, the "Review Team") are hereby authorized to review, in the first instance, the COMPUTERS and the information and materials contained in them, as set forth in this Attachment B.

If law enforcement determines that all, some, or a portion of the information or materials on the COMPUTERS contain or may contain information or material subject to a claim of attorney-client privilege or work-product protection (the "Potentially Privileged Materials"), the Review Team is hereby ordered to: (1) immediately cease its review of the specific Potentially Privileged Materials at issue; (2) segregate the specific Potentially Privileged Materials at issue; and (3) take appropriate steps to safeguard the specific Potentially Privileged Materials at issue.

Nothing in this Attachment shall be construed to require law enforcement to cease or suspend the Review Team's review of the COMPUTERS upon discovery of the existence of Potentially Privileged Materials on one or more of the COMPUTERS.